STUCKY, Judge
(dissenting):
The majority is correct; this is an unfortunate case. But while the military judge may not have followed best practice by failing to articulate specific findings of fact, I cannot find that she misapplied the Supreme Court’s test in Press-Enterprise Co. v. Superior Court (Press-Enterprise I), 464 U.S. 501,104 S.Ct. 819, 78 L.Ed.2d 629 (1984). Because a proper foundation for closing the courtroom during part of BP’s testimony is evident from the record, I would find no abuse of discretion and, therefore, no deprivation of the *343 Sixth Amendment right to a public trial. As such, I dissent.
I find the majority’s analysis unpersuasive for two related reasons. First, I do not understand the plain language of either Press-Enterprise I, or United States v. Hershey, 20 M.J. 433 (C.M.A.1985), to require the military judge to “affirmatively ... articulate[ ] findings” on the record. United States v. Ortiz, 66 M.J. at 339 (C.AA.F.2008). In Press-Enterprise I, the Supreme Court simply required “findings specific enough that a reviewing court can determine whether the closure order was properly entered,” 464 U.S. at 510,104 S.Ct. 819, much like any reviewing court requires a record adequate for review. See, e.g., Bradshaw v. Stumpf, 545 U.S. 175, 183, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005) (citing Boykin v. Alabama, 395 U.S. 238, 244, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)). To demand anything more transforms what was intended as a flexible approach into a formalistic one, regardless of the majority’s suggestion to the contrary.
Second, though I remain doubtful that this was a complete closure, even the assumption that it was does not support the majority’s view that making explicit findings on the record is a prerequisite to upholding the closure in this case. While the majority might not have found any complete closure case in which a federal court adopted a non-formulaic approach to findings, that is so because the adequacy of findings was not at issue in most cases. After all, most judges simply make explicit findings. The majority cites no case that actually holds that completeness of the closure is the fulcrum upon which the findings prong sits.
Instead, it cites cases concerning the relaxation of the first prong of the Press-Enterprise I test in partial closure cases. In Bell v. Jarvis, 236 F.3d 149 (4th Cir.2000), the United States Court of Appeals for the Fourth Circuit made clear that
while the Supreme Court has never set forth a less rigorous standard for partial closures, some circuits have relaxed the first Waller requirement where a temporary or partial closure of a proceeding is at issue. Specifically, these circuits have required only that the state advance a “substantial reason” for closing the proceeding because, unlike those situations involving a complete closure, a partial closure does not threaten as acutely the historical concerns sought to be addressed by the Sixth Amendment.
Id. at 168 n. 11; see also United States v. Osborne, 68 F.3d 94, 98-99 (5th Cir.1995); United States v. Farmer, 32 F.3d 369, 371 (8th Cir.1994); United States v. Sherlock, 962 F.2d 1349, 1356-57 (9th Cir.1989); Nieto v. Sullivan, 879 F.2d 743, 753 (10th Cir.1989); Douglas v. Wainwright, 739 F.2d 531, 532-33 (11th Cir.1984) (per curiam).
The rationale for maintaining a heightened burden on the government with regard to the first prong is, thus, that complete closures implicate Sixth Amendment concerns more seriously than partial closures. It makes intuitive sense, then, to raise the hurdle the government must jump over to show a need to bar, say, the press, the public, and the defendant’s family, rather then just the press. However, it is neither equally as intuitive nor required by the test’s plain language to heighten the requirements of the fourth prong for the same reason. After all, the first prong of the Press-Enterprise I test is qualitatively different from the final three. The former places a burden on the party seeking closure; the latter three assign responsibilities to the court.
Alternatively, the Supreme Court constructed the first three prongs out of respect for the right of access to criminal trials. Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 606, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (referring to the “particularly significant role” public access plays in the proper functioning of the judiciary because “[p]ublic scrutiny of a criminal trial enhances the quality and safeguards the integrity of the fact-finding process, with benefits to both the defendant and to society as a whole ... [and] fosters an appearance of fairness, thereby heightening public respect for the judicial process____ [I]n the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the *344 judicial process — an essential component in our structure of self-government”). The intention behind the fourth prong, however, was to ensure that “a reviewing court can determine whether the closure order was properly entered.” Press-Enterprise I, 464 U.S. at 510,104 S.Ct. 819.
Through either lens, the first and fourth prongs of the Press-Enterprise I test are analytically distinct. An admittedly logical rationale for heightening a party’s burden under the former cannot automatically translate into an appropriate reason to heighten a different party’s responsibility under the latter. This is likely the reason why courts, when presented with less than complete findings on the record in partial closure cases, do not base their acceptance of such findings vis-a-vis the fourth prong on the grounds that partial closures do less harm to the right of access at the core of the Sixth Amendment. See, e.g., Bell, 236 F.3d at 170-71 (upholding a partial closure even without explicit findings because the record revealed the judge knew the witness’s particular characteristics, the facts of the case, and the nature of the testimony); United States v. Bow, 1997 U.S.App. LEXIS 5326, at *8,1997 WL 124345, at *3 (9th Cir.1997) (same). In Bell and Bow, then, what merited acceptance of nonexplicit findings was not that partial closures caused less harm to Sixth Amendment rights, but because the records of trial, upon the appellate courts’ own review, described facts necessary to meet each prong and adequately evidenced the judge’s rationale in deciding to close the courtroom.
The record in Appellant’s case is equally sufficient. First, it is replete with evidence of the need to close the courtroom. Trial counsel moved for courtroom closure after a lengthy attempt to extract audible testimony from BP and after her body language and rude behavior suggested her level of discomfort. BP had “difficulty testifying____resulting from some embarrassment,” according to trial counsel, and clearing the gallery of spectators would alleviate that embarrassment. Given that the Discussion to Rule for Courts-Martial (R.C.M.) 806(b) requires an overriding interest and lists avoiding embarrassment as one such interest, the record reasonably describes the military judge’s understanding that trial counsel advanced a recognized overriding interest to close the courtroom, thus satisfying the test’s first prong.
The record also makes clear that the military judge narrowly tailored the closure to suit the needs of the witness and the overriding interest offered by the Government. Before granting the motion, the military judge questioned the witness extensively. BP admitted that she was speaking in a low, mumbled tone because she was nervous. After some additional questioning, the witness also admitted that her nerves made it difficult to testify and that she was nervous because there were so many people in the gallery. The military judge asked if the witness would be more at ease if she faced away from the spectators and spoke directly to the military judge. The witness still maintained that she was nervous. Given BP’s age, Post-Traumatic Stress Disorder diagnosis, and the private nature of the allegations against Appellant, her nervousness is understandable. Moreover, upon deciding to close the courtroom, the military judge advised counsel that she wanted to “minimize the time that the courtroom is going to be closed,” even stating that as soon as the witness appeared more comfortable testifying, the courtroom would be reopened. In addition, BP actually testified in public for nearly one-third of her testimony. She started her testimony shortly after 9:30 a.m. and continued to shortly after 10:54 a.m., representing fifty-three pages in the record. She testified in closed court until page 210 of the record and was later recalled for another ten pages.
Finally, the record indicates that the military judge considered a number of alternatives before closing the courtroom. She used a comfort break, admonished the witness to behave in a courteous manner, asked if turning away from the spectators would relieve the witness’s nervousness, and directed trial counsel to move to another area of the courtroom to facilitate the witness in projecting her voice. All these failed. The witness continued to slouch, mumble under her *345 breath, make rude comments, and manifest her discomfort as a witness in open court. The military judge’s only remaining recourse was to close the courtroom.
Since the record in this case is adequate to support this Court’s review and because the record evidences a narrowly tailored closure used as a last resort and based on a recognized overriding interest, I would uphold the military judge’s decision to close the courtroom during part of BP’s testimony. I therefore dissent.